UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| THE ESTATE OF JOSHUA E. EBINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-cv-00171-SEB-KMB |
| | ) | |
| A.J. SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now before the Court is Defendants' Motion for Summary Judgment [Dkt. 64]. Plaintiff, the Estate of Joshua E. Ebinger (the "Estate") brings this action pursuant to 42 U.S.C. 1983 against Defendants Indiana State Trooper Ben Bastin and Ripley County Sheriff's Deputies A.J. Smith and Robbie Bradley,[1] in their individual capacities, alleging that Defendants used excessive force against Joshua E. Ebinger, resulting in his death, in violation of the Fourth Amendment to the United States Constitution. For the reasons detailed below, we GRANT Defendants' Motion for Summary Judgment.

**Factual Background**

On October 10, 2021, the three Defendants, along with Versailles Police Officer Joe Mann, responded to a domestic call involving a man, later identified as Joshua

---

[1] The Estate originally named additional individuals and entities as defendants in this litigation, including the Ripley County Sheriff's Office, Ripley County Commissioners, the Indiana State Police and Trooper Bastin in his official capacity, the Versailles Town Council, and Versailles Police Officer Joe Mann, in his individual and official capacities, all of whom have since been dismissed, either pursuant to stipulation or by court order.

1

Ebinger, who was reported to be in possession of a firearm. Deputy Smith understood from dispatch that it was a domestic problem and that the woman on the telephone was unable to speak freely. Smith Aff. ¶ 3. Deputy Bradley likewise heard the 911 call and learned that dispatch was having difficulty getting information from the woman who had made the call because she was in a room with a man (Mr. Ebinger) with a gun who had stated that he was "not going back to jail." Bradley Aff. ¶ 3. While in route to the scene, Deputy Bradley also learned of a court order protecting the woman from Mr. Ebinger. Based on this information, Deputy Bradley believed that he was responding to a hostage situation, so he activated his lights and siren due to his concerns about the seriousness of the situation. *Id.* ¶ 4.

While on duty, Trooper Bastin also heard the domestic disturbance call over the county dispatch and heard there was a man with a gun and that the woman in the residence was unable to leave. Bastin Aff. ¶ 3. Because of these serious circumstances, including the presence of a firearm, Trooper Bastin decided to respond to the location to assist. *Id.* ¶ 4. Trooper Bastin wore a body camera, which recorded the encounter. *See* Exh. C-1 (Body Camera Video).

Deputy Smith told the other responding officers to meet at a rally point on State Road 48 and County Road 800 East, a location down the road from the residence to which they were responding to establish a "game plan" before arriving at the scene. Smith Aff. ¶ 4; Bradley Aff. ¶ 5. Deputy Smith arrived first, followed by Deputy Bradley, Trooper Bastin, and Officer Mann, who all arrived around the same time. Bastin Aff. ¶ 5; Exh. C-1 at 12:17–13:03. The four officers discussed a plan for approaching the

2

residence to address the situation inside.  Bradley Aff. ¶ 5; Bastin Aff. ¶ 7, Exh. C-1 at 13:10–15:50.  Deputy Bradley first suggested calling SWAT, but, because the woman was still in the residence, the officers did not want to wait the time it would take for SWAT to respond.  Bastin Aff. ¶ 8; Smith Aff. ¶ 4; Exh. C-1 at 13:37–15:50.

The officers then drove to the residence, with Deputies Smith and Bradley approaching from the east and Officer Mann and Trooper Bastin coming from the west.  Smith Aff. ¶ 5; Bastin Aff. ¶ 9.  While in route to the house, dispatch notified via radio traffic that the name of the woman being held in the residence was Serena.  Bastin Aff. ¶ 10; Exh. C-1 at 19:10–19:24.

When he arrived on the scene, Trooper Bastin parked his Indiana State Police cruiser so that it blocked the road.  Bastin Aff. ¶ 11.  It was Trooper Bastin's practice to carry his department rifle on any call involving a firearm, so he retrieved his rifle upon exiting the vehicle, and he and Officer Mann walked toward the home.  *Id.* ¶¶ 11, 12; Exh. C-1 at 20:15–20:35.  Upon reaching the residence, Trooper Bastin took a position in the yard covering the northeast corner of the house.  Bastin Aff. ¶ 13; Exh. C-1 at 20:35–20:40.

Meanwhile, Deputy Smith parked his car on the road on the east side of the residence, also retrieving his department rifle from the trunk of his vehicle, and approached the home on foot.  Smith Aff. ¶ 5.  Upon exiting his vehicle, Deputy Bradley loaded his shotgun with buck shot and took a position in the rear of the house to confront any occupant who might try to exit out the back.  Bradley Aff. ¶¶ 5, 6.  Before Deputy Bradley reached the rear of the residence, the woman from inside—Serena—exited the

house through the front door and Trooper Bastin directed her toward Deputy's Smith location, down the driveway. *Id.* ¶ 6; Bastin Aff. ¶¶ 13–14; Exh. C-1 at 20:40–20:50. As she approached, Deputy Smith overheard her on the phone talking with the dispatcher and was alerted by dispatch that the man inside, Mr. Ebinger, was suicidal and had said that he was not going back to jail. Smith Aff. ¶ 6.

Officer Mann told Trooper Bastin the man's name—Joshua Ebinger—and reported that he was on probation. Bastin Aff. ¶ 15; Exh. C-1 at 21:17–21:22. After Trooper Bastin notified dispatch by radio that Serena was out of the residence, he heard noise coming from the doorway. Bastin Aff. ¶¶ 16–17; Exh. C-1 at 21:35–21:38; 22:18–22:38. Officer Mann, who was standing behind a black SUV that was parked in the driveway of the residence, ordered Mr. Ebinger to come out of the home with his hands up. Bastin Aff. ¶ 18; Exh. C-1 at 22:27–22:45. Trooper Bastin directed Deputy Bradley, who was still at the back of the residence, to cover the side door as Trooper Bastin moved behind Officer Mann (who was behind the black SUV) to cover him. Bastin Aff. ¶ 19; Exh. C-1 at 22:34–22:58. The officers repeatedly called out and ordered Mr. Ebinger to keep his hands up and come out of the house. Bastin Aff. ¶ 17; Exh. C-1 at 22:27–22:50.

When Mr. Ebinger did not come out of the residence, Trooper Bastin moved back to the northeast corner of the house and notified dispatch that Mr. Ebinger had retreated into the home and refused to come out. Bastin Aff. ¶ 20; Exh. C-1 22:58–23:14. Officer Mann approached the front of the residence from where he briefly observed Mr. Ebinger in a window, before Ebinger disappeared from view inside the house. Bastin Aff. ¶ 21; Exh. C-1 at 23:17–23:23.

4

Trooper Bastin told Deputy Bradley, who was still monitoring the back of the residence, to pay attention to a door on the side of the garage, since he did not know what was behind the door and could not see through it; he worried that Mr. Ebinger could attempt to open the door or take a shot through it. Bastin Aff. ¶ 22; Exh. C-1 at 24:19–24:25. Accordingly, from his position at the northeast corner of the house, Trooper Bastin monitored the side door as well as maintained a watch for movement at the front of the house.

Shortly thereafter, Trooper Bastin heard a noise from inside the house near the front door, and ordered Mr. Ebinger to leave his weapon inside, and come out and show his hands. Bastin Aff. ¶ 23; Exh. C-1 at 24:48–25:03. Officer Mann simultaneously approached the front of the residence and stood near the front door with his gun drawn. Bastin Aff. ¶ 24; Exh. C-1 at 25:08–25:10. The other officers also shouted orders to Mr. Ebinger to come out of the residence. Bastin Aff. ¶ 25; Exh. C-1 at 24:55–25:13. Trooper Bastin moved from his position at the northeast corner of the home and took cover behind the SUV with his rifle pointed toward the front door. *See* Exh. C-1 at 25:02–25:09.

At this point, Mr. Ebinger walked out of the front door of the residence holding a firearm in his right hand. Bastin Aff. ¶ 26; Exh. C-1 at 25:09–25:12. Trooper Bastin repeatedly ordered Mr. Ebinger to put the gun down and the other officers ordered him to get on the ground, but Mr. Ebinger disregarded all these orders. Bastin Aff. ¶ 27; Exh. C-1 at 25:09–25:18. Deputy Bradley moved from the back of the house to the northeast corner, approximately thirty feet from Mr. Ebinger and pointed his shot gun at Mr.

5

Ebinger. Bradley Aff. ¶ 7. Deputy Smith, who had been standing back from the scene with Serena, moved up near Deputy Bradley to take a position in front of the SUV. Smith Aff. ¶¶ 6–7. Trooper Bastin again ordered Mr. Ebinger not to raise or point the gun, while Deputy Smith attempted a different tack and began urging Mr. Ebinger to put the gun down. Bastin Aff. ¶ 28; Smith Aff. ¶ 7; Exh. C-1 at 25:18–25:24.

    Mr. Ebinger refused to comply with the officers' orders and pleas, instead raising the gun in his hand, pointing it upward. Bastin Aff. ¶ 28; Exh. C-1 at 25:19–25:29. Trooper Bastin again ordered Mr. Ebinger to put the gun down, but Mr. Ebinger continued to hold the gun, lowering his hand and leveling the weapon, and pointing it directly at Trooper Bastin. Bastin Aff. ¶¶ 29, 30; Exh. C-1 at 25:25–25:32. Being fearful that Mr. Ebinger was going to shoot him, Trooper Bastin moved back to gain more cover behind the SUV. Bastin Aff. ¶ 30; Exh. C-1 at 25:30–25:32. Mr. Ebinger continued to point his gun at Trooper Bastin, who, as he later testified, feared for his safety and that of the other officers because he believed that Mr. Ebinger was about to start firing the gun. Bastin Aff. ¶ 31. The other officers continued to order Mr. Ebinger to lower his weapon, but he refused, training his sights on the front of the SUV where Deputies Smith and Bradley were positioned, and turning his body toward them, with his gun pointed in their direction. Bastin Aff. ¶¶ 32–34; Exh. C-1 at 25:29–25:42.

    Deputy Smith has testified that at this point he believed that Mr. Ebinger was going to shoot him or Deputy Bradley. Smith Aff. ¶ 8. While Mr. Ebinger's weapon was pointed towards Deputies Smith and Bradley, Deputy Smith shot him. *Id.*; Exh. C-1 at 25:42–25:44. Trooper Bastin simultaneously fired his weapon at Mr. Ebinger, believing

that Mr. Ebinger was going to shoot the deputies. Bastin Aff. ¶ 34. Deputy Bradley has testified that he, too, believed he needed to shoot, but he did not fire his weapon because he feared that, if he did so, with Officer Mann standing in close proximity to Mr. Ebinger, he might accidentally hit Officer Mann with the buck shot he was using. Bradley Aff. ¶ 9.

Trooper Bastin notified dispatch via radio that shots had been fired and that the officers were unharmed. Bastin Aff. ¶ 35; Exh. C-1 at 25:55–26:36. He obtained a medical kit from his vehicle, and he and Officer Mann attempted to render aid to Mr. Ebinger. Bastin Aff. ¶ 36; 28:40–30:10. Deputy Smith called for an ambulance and Deputy Bradley called for EMS and began photographing the scene. Smith Aff. ¶ 9; Bradley Aff. ¶ 11. Indiana State Police Trooper Kyle Stovall arrived and along with Officer Mann cleared the house to ensure there were no other threats inside. Bastin Aff. ¶ 37; *see* Exh. C-1 at 30:34–37:35. First responders arrived to render medical assistance to Mr. Ebinger, but ultimately he died as a result of the gunshot wounds. Dkt. 21 ¶ 5; Exh. C-1 at 34:18–37:35.

On October 10, 2023, the Estate filed its complaint in this litigation against Defendants as well as several other entities and individuals who have since been dismissed from the case, alleging that Defendants used excessive force against Mr. Ebinger in violation of his Fourth Amendment rights. Now before the Court is Defendants' motion for summary judgment on those claims, to which the Estate has not responded. Accordingly, the motion is ripe for ruling.

## Legal Analysis

I.     **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Our Local Rules instruct the non-moving party to respond to a summary judgment motion by identifying determinative and disputed facts that create a triable issue.  S.D. Ind. Local Rule 56-1(b).  Here, the Estate has filed no response to Defendants' motion for summary judgment.  In the absence of a nonmovant's responsive brief, "the facts as claimed and supported by admissible evidence by the movant are admitted without controversy[.]" *Id.* 56-1(f)(1).  In other words, when, as here, the non-moving party fails to respond, it effectively concedes the moving party's version of the facts.  *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").  Though we still construe the facts in the light most favorable to the non-moving party, a party's nonresponse "limit[s] the scope of facts a court may take into account in

8

determining whether a genuine issue of material fact exists[.]" *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

## II.     Discussion

Defendants have moved for summary judgment on the Estate's Fourth Amendment excessive force claims on the grounds that Defendant Bradley used no force against Mr. Ebinger and that the force used by Defendants Bastin and Smith was objectively reasonable under the circumstances, and, in any event, that they are all entitled to qualified immunity. Because we find for the reasons detailed below that Defendants' use of force did not violate Mr. Ebinger's constitutional rights, the Estate's Fourth Amendment claims cannot survive.

The Fourth Amendment guarantees citizens the right "to be secure in their persons … against unreasonable … seizures" of the person. U.S. Const. Am. IV. This includes the right to be free from an unreasonable seizure conducted through the use of excessive force. Whether the force employed by an officer in effecting a seizure is constitutionally excessive depends on its "objective reasonableness," which is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and is considered in light of the specific facts and circumstances of that particular case. *Graham v. Connor*, 490 U.S. 386, 396, 397 (1989) (citations omitted). Factors influencing the reasonableness of the force include but are not limited to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Id.* at 396.

In analyzing a police officer's use of force, the Court must "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Weinmann v. McClone*, 787 F.3d 444, 448–49 (7th Cir. 2015) (quotation marks and citation omitted); *see also Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009) ("[T]he police are entitled to err on the side of caution when faced with an uncertain or threatening situation."). "This is true even when, judged with the benefit of hindsight, the officer[] may have may have made some mistakes." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020) (internal quotation marks and citation omitted).

In circumstances involving the use of deadly force, such as those presented here, the Court must focus on "the danger posed by the person to whom the force was applied." *Est. of Biegert by Biegert v. Molitor*, 968 F.3d 693, 699 (7th Cir. 2020). In such cases, "the totality of the circumstances to justify a seizure includes the period just before and during the shooting." *Smith v. Finkley*, 10 F.4th 725, 739 (7th Cir. 2021) (citation omitted). The Court must assess "whether a reasonable officer in the circumstances would have probable cause to belief that the suspect poses an immediate threat to the safety of the officers or others." *Molitor*, 968 F.3d at 699 (quoting *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018)). The Seventh Circuit has warned that an individual "does not pose 'an immediate threat of serious harm' solely because he is armed." *Molitor*, 968 F.3d at 700. However, "if the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has

10

been shown," even in cases where "a less deadly alternative is available to the officers." *King*, 954 F.3d at 985 (citation omitted).

In excessive force cases, "[t]he obligation to consider the totality of the circumstances … often makes resort to summary judgment inappropriate." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020). If, however, "a careful examination of the evidence leaves material facts undisputed, or leads to only one rational conclusion, then the question of reasonableness becomes a pure question of law for the court." *Logan v. City of South Bend*, 564 F. Supp. 3d 719, 729 (N.D. Ind. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Siler*, 957 F.3d at 759). "[I]f there are sufficient undisputed material facts to establish that the officer acted reasonably under the circumstances, then the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015).

Applying these legal principles to the undisputed facts before us, we find as detailed below that Defendants' actions did not violate the Fourth Amendment.

### A.   Trooper Bastin

We turn first to address the Estates' excessive force claim against Trooper Bastin. In assessing the reasonableness of Trooper Bastin's actions, "[w]hat is important is the amount and quality of information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Here, the undisputed facts establish that, at the time Trooper Bastin fired his weapon, he knew that Mr. Ebinger had been

11

involved in a domestic dispute, was in possession of a gun, had indicated that he was not going back to jail, had repeatedly ignored orders from law enforcement to drop his weapon and instead had escalated the situation by pointing the gun at Trooper Bastin, and at the moment shots were fired, had pointed his gun at Deputies Smith and Bradley.

Under these circumstances, there can be no dispute that a reasonable officer in Trooper Bastin's position would have probable cause to believe that Mr. Ebinger posed an immediate threat to the officers, specifically to Deputies Smith and Bradley. Thus, we hold that Trooper Bastin acted reasonably in using deadly force against Mr. Ebinger.[2] *See, e.g.*, *Weinmann v. McClone*, 787 F.3d 444, 449–450 (7th Cir. 2015) ("If [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force …."); *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (finding that "[b]ecause [the officer] saw [the suspect] draw a gun and begin to point it in his direction, he acted reasonably under the circumstances" by shooting the suspect); *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018) ("[The suspect] threatened the officers when he pointed a gun at them. … Accordingly, [the officer] did not act unreasonably when he responded with deadly force.").

Nor is there evidence to support the Estate's contention that Trooper Bastin failed to provide medical aid following the shooting. On the record before us, it is undisputed

---

[2] We note also that Trooper Bastin did not immediately resort to the use of deadly force when Mr. Ebinger pointed the gun at him, but first attempted to take cover behind the SUV. Trooper Bastin fired his weapon only after Mr. Ebinger had turned the gun toward Deputies Smith and Bradley, who were positioned in front of the SUV and therefore had no cover.

12

that immediately following the shooting, Trooper Bastin retrieved a medical kit from his vehicle and attempted to provide aid to Mr. Ebinger until first responders arrived. The Estate puts forth no argument or evidence to the contrary. Trooper Bastin is therefore entitled to summary judgment on the claims alleged against him by the Estate.

### B. Deputy Smith

For largely the same reasons, we hold that Deputy Smith did not violate Mr. Ebinger's Fourth Amendment rights by using deadly force to defend himself and the other officers once Mr. Ebinger had pointed a gun at them. Like Trooper Bastin, Deputy Smith also knew at the time he fired his weapon that Mr. Ebinger had a gun, that he had failed to comply with repeated orders to drop the gun, that he was pointing the gun in various directions, first up in the air, then at Trooper Bastin, and, at the time Deputy Smith fired his weapon, at Deputies Smith and Bradley. Again, as discussed above with reference to Trooper Bastin's actions, once Mr. Ebinger threatened Deputy Smith with his gun by pointing it toward him, Deputy Smith was justified in using deadly force to protect himself.

Directly following the shooting, Deputy Smith called for an ambulance while Trooper Bastin and Officer Mann attempted to provide medical aid to Mr. Ebinger. Thus, there is no basis to find that Deputy Smith violated Mr. Ebinger's constitutional rights by failing to provide medical aid. For these reasons, Deputy Smith is entitled to summary judgment on the Estate's claims against him.

### C. Deputy Bradley

Finally, the Estate's Fourth Amendment claim against Deputy Bradley fails because he did not use any force against Mr. Ebinger nor has there been any showing by the Estate that any failure on Deputy Bradley's part to render medical aid caused constitutional injury to Mr. Ebinger. Liability under § 1983 is direct rather than vicarious, meaning that for a defendant to be held liable under § 1983, he must have been personally involved in the violation of the plaintiff's constitutional rights. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018); *Kindlow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008).

The undisputed facts before us establish that Deputy Bradley never fired his weapon or used any other force against Mr. Ebinger, and that, after the shooting occurred, Deputy Bradley called for EMS while Trooper Bastin and Officer Mann were attempting to provide medical aid to Mr. Ebinger. Accordingly, Deputy Bradley is entitled to summary judgment on the Estate's Fourth Amendment claim.

## III. Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment [Dkt. 64] is <u>GRANTED</u>. Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date: 4/18/2025

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

14

Distribution:

Bethanni E. Forbush-Moss
Law Offices of Forbush-Moss PSC
attorney@kentuckianalaw.net

Douglas Alan Hoffman
Carson LLP
hoffman@carsonllp.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Stephen C. Keller
Barnes Maloney PLLC
skeller@sbmkylaw.com

Alexander Thomas Myers
Office of Indiana Attorney General
alexander.myers@atg.in.gov